1   Raymond N. Stella Erlach, SBN 056958
    LAW OFFICES OF
2   RAYMOND N. STELLA ERLACH
    275 Battery Street, Suite 2600
3   San Francisco, CA  94111
    Telephone:  (415) 788-3322
4   Facsimile:  (415) 788-8613
    E-mail:  rerlach@rayerlach.com
5
6   Attorneys for Defendant Norman E. Wielsch

7

8                       UNITED STATES DISTRICT COURT

9                     NORTHERN DISTRICT OF CALIFORNIA

10  _____
                                     )
11  UNITED STATES OF AMERICA,        )   Case No. CR 11-00529-1 SBA (KAW)
                                     )
12             Plaintiff,            )
                                     )
13         v.                        )   DEFENDANT NORMAN E. WIELSCH'S
                                     )   MOTION FOR DEPARTURE
14  NORMAN WIELSCH,                  )
                                     )   AND REQUEST FOR
15             Defendant.            )   EVIDENTIARY HEARING
                                     )
16                                   )   AND <u>EXHIBITS 1 THROUGH 19</u>
                                     )
17                                   )   [Local Rule 32-5(b)]
                                     )
18                                   )
                                     )   Date:  May 13, 2013
19                                   )   Time:  10:00 a.m.
                                     )   Department:
20                                   )   The Honorable Saundra Brown Armstrong
                                     )
21  _____)

22

23  I.           <u>INTRODUCTION AND ALLOCUTION TO THE SENTENCING COURT</u>

24          The Defense respectfully moves the Court for a departure under Federal Rules of

25  Criminal Procedure Rule 32 and submits that Norman Wielsch should be sentenced to a suitable

26  period of home confinement with mandatory regular psychological care, medical care, public

27  service, and supervision, all at defendant's expense, for the period of years the Court deems

28  sufficient.

This motion argues for a departure from the sentence prescribed by the Federal

Sentencing Act to give effect to statutory directives for emotional and mental conditions which the

United States Sentencing Commission has failed to incorporate into the United States Sentencing

Guidelines.

A.     **_The United States Sentencing Guidelines Fail To Effect Congressional Directives_**

The Congress in enacting section 994(d)(4) of title 28 United States Code directed

the United States Sentencing Commission to provide the courts with alternatives to the guideline

sentences for offenders with substantial emotional and mental conditions which were connected

with the criminal conduct.

The subsection in relevant part provides:

> (d)     The Commission in establishing categories of defendants for use in the guidelines and policy statements governing the imposition of sentences of probation, a fine, or imprisonment, governing the imposition of other authorized sanctions, governing the size of a fine or the length of a term of probation, imprisonment, or supervised release, and governing the conditions of probation, supervised release, or imprisonment, shall consider whether the following matters, among others with respect to a defendant, have any relevance to the nature, extent, place of service, or other incidents of an appropriate sentence, and shall take them into account only to the extent that they do have relevance--

> ...

> (4)     mental and emotional condition to the extent that such condition mitigates the defendant's culpability or to the extent that such condition is otherwise plainly relevant;

[Volume 2, *Federal Sentencing Guidelines Manual* (West, 2012), § 994(d)(4), pp. 57-58.]

As will be seen below, under title 28 United States Code section 994(d)(4), the

Sentencing Commission did provide the courts with alternative sentencing options to the guideline

ranges for offense levels falling into Zones A, B, and C of the Sentencing Table, but failed to do so

for offense levels falling into Zone D, or for so-called mandatory minimum sentences, precisely

where needed most and where defendant's sentencing will be directly impacted.

Because the guidelines fail to provide the statutorily mandated relief, the Court in

sentencing defendant must fashion its own relief under title 28 United States Code

section 994(d)(4).  Defendant proposes that the Court sentence defendant to home confinement with

1   mandated supervision, treatment (both at defendant's expense), and community service, suitable in

2   light of defendant's health, for such a period of time as the Court deems appropriate.

3   **B.**   ***This Motion Is Proper Pursuant to Title 18 United States Code Section 3553(a)***

4   In the Plea Agreement, defendant retained the right to request a variance from the

5   guideline range determined by the Court pursuant to the factors under title 18 United States Code

6   section 3553(a) (Plea Agreement, 8:26-28).  Herein, defendant requests a departure from the

7   guidelines sentencing level.

8   **C.**   ***Leaving the Baby on the Court's Doorstep***

9   The Government agrees that the Defense has the absolute right under the Plea

10   Agreement to argue the factors under title 18 United States Code section 3553(a) [aside from the

11   Plea Agreement, consideration of the factors under section 3553(a) is mandatory as a matter of law

12   regardless of the agreement].  The Government, however, contends that if Defense *requests* a

13   sentence below ten years it would be a breach of the Plea Agreement, while recognizing that, under

14   title 18 United States Code section 3553(f) and section 3553(a)(1), the Court itself may impose the

15   sentence the Court deems is "sufficient but not greater than necessary."[1]  The Defense thus "leaves

16   the baby on the Court's doorstep" and requests a "sufficient" sentence, giving consideration to <u>all</u>

17   factors in subsections (a) and (f) of section 3553.

18   As has been stated, the Court must consider the factors under title 18 United States

19   Code section 3553(f), as consideration of the section is mandatory and applies "[n]otwithstanding

20   any other provision of law."[2]

21   Considering all the factors and applying the mitigation directed by section 994(d)(4),

22   Defense requests the Court impose a sentence of home confinement for the number of months the

23   Court determines is appropriate and sufficient after due review of the guidelines.

24

25   _____

26   [1]   To say the least, the Plea Agreement is ambiguous in giving and, according to the Government, taking away matters of great importance to the defendant (Plea Agreement, 8:25--9:1).

27   [2]   The "government cannot contract around the safety value" in section 3553(f) [*U.S. v.*
28   *Santiago* (C.A. First Circ. 2000) 211 F.3d 146, 152.  The holding is based on Ninth Circuit authorities.

1    As this Motion for Departure and Request for Evidentiary Hearing asserts, under

2    subsection (a) of section 3553 of title 18 of the United States Code, a sentence of home confinement

3    tailored to provide defendant with necessary care and treatment is appropriate considering the nature

4    and characteristics of the offenses and the history and characteristics of the defendant,[3] the

5    seriousness of the offenses, promotion of respect for the law and just punishment,[4] for deterrence,[5]

6    and protection of the public.[6]

7    *Because* suitable sentencing alternatives, otherwise appropriate for defendant, have

8    not been provided for under the guidelines, under section 994(d)(4) the Court should impose home

9    confinement with the conditions and for the period the Court deems proper.

10   **D.    *Three Overarching Considerations***

11   The Presentence Report favors a lengthy incarceration, focusing on the above factors

12   in the offenses.  There are, however, three *overarching* considerations which should guide the

13   Court's sentencing determination:

14   (1)    the Policy Statement for "Mental and Emotional Conditions" under *Federal*

15   *Sentencing Guidelines Manual* section 5H1.3 [issued pursuant to 28 U.S.C. § 994(a)(2) as required

16   under 18 U.S.C. § 3553(a)(5), which the Presentence Report does not address (see below)];

17   (2)    the history and characteristics of the defendant and the plain-to-see relevance of

18   defendant's mental condition [under 18 U.S.C. § 3553(a)(1), *supra*]; and,

19   (3)    the needed medical care and correctional treatment [18 U.S.C. § 3553(a)(2)(D)] and

20   the Policy Statement applicable to defendant's physical condition under *Federal Sentencing*

21   *Guidelines Manual* section 5H1.4.

22

23

24   _____

25   [3]    [18 U.S.C. § 3553(a)(1).]

26   [4]    [18 U.S.C. § 3553(a)(2)(A).]

27   [5]    [18 U.S.C. § 3553(a)(2)(B).]

28   [6]    [18 U.S.C. § 3553(a)(2)(C).]

**E.**     *Only Mental Disease Explains This Case*

As the Presentence Report establishes, this is an exceptional case.  A 24-year-veteran officer, commander of an elite narcotics bureau, suffering from despair and deep depression, is unable to carry out his suicide and instead commits easily traceable offenses in the open, literally begging to be caught, oblivious to all he knew about narcotics investigation techniques.  WHY? Only mental disease can explain it.

All of the factors under subsections (a) and (f) of section 3553 of title 18 of the United States Code are discussed below and in the rather extensive exhibits provided to aid the Court in determining a just and appropriate sentence.  All of the doctors, psychiatrists, psychologists, religious leaders, officers of public benefit organizations, friends, and relatives providing information for the Court herein are available to testify, to be cross-examined, and to explain the reasoning behind their submissions to the Court.  Defendant will produce them all, should the Court so desire.

**II.**          **REQUEST FOR EVIDENTIARY HEARING**

Pursuant to Local Rule 32-5(b), defendant requests an evidentiary hearing on the following three issues:

(1)     the transactions whereby Carl Moreno purchases methamphetamine and marijuana in hand-to-hand transfers with Mr. Butler at Mr. Butler's offices (to establish defendant was not a leader or instigator);

(2)     defendant's confessions and interviews with federal, state, and local investigators after his arrest (to establish defendant truthfully provided the Government with all information concerning the offenses); and,

(3)     testimony of Board-Certified Forensic Psychiatrist Roger Freed, M.D., to the mental-disease process, the absence of a public safety concern, to the defendant's despair and depression, and his mental condition under section 994(d)(4); Dr. Freed can also summarize the medical evidence provided to the Court in his own report, Exhibit 1, and in the reports of other doctors in Exhibits 5, 6, and 7, to describe defendant's debilitating, incurable, progressive nerve disease and his physical condition.

1  (Defendant will contact the United States Attorney to determine whether any of the facts are

2  appropriate for a stipulation, to save the Court's time.)

3  **III.      CRIMINOLOGISTS'S SUMMARY OF THE EXTENSIVE EXHIBITS**

4  **PRESENTED TO THE COURT**

5           Defendant attaches 19 exhibits to this Motion for Departure and Request for

6  Evidentiary Hearing.

7       **A.    *The Medical and Psychiatric Proof***

8           Attached hereto are the reports of Board-Certified Psychiatrist Roger Freed, M.D.

9  (Exhibit 1, Report of Roger Freed, M.D., Board-Certified Psychiatrist); Joel Fay, Ph.D. (Exhibit 6,

10  Letter from Joel Fay, Ph.D., Norman Wielsch's Treating Psychologist); Jeffrey Whiting, Ph.D.

11  (Exhibit 5, Psychological Assessment by Jeffrey Whiting, Ph.D., Clinical and Forensic

12  Psychologist); and Jonathan S. Katz, M.D. (Exhibit 7, Letter from Jonathan S. Katz, M.D.,

13  Specialist in Neuromuscular Diseases and Director of the Neuromuscular Clinic at the Forbes Norris

14  Center in San Francisco, Regarding Norman Wielsch's Charcot-Marie-Tooth Disease). These

15  reports establish defendant's serious mental illness and despair and the "trigger" of the progressive,

16  debilitating, untreatable neurological disease crippling defendant physically and leading to his

17  severe depression and despair.

18           In Exhibit 1, Board-Certified Psychiatrist Roger Freed, M.D., establishes the mental

19  disease process, resulting in despair corrupting the mind's ability to think and, after failed suicide

20  attempts, in choices leading to the criminal offenses which are almost "too stupid" to explain. It is

21  uncontested that defendant was suffering from severe depression at the time of the commission of

22  the crimes in the Indictment. The MMPI (Minnesota Multiphasic Personality Inventory) is the

23  standard in the industry. The results were used by Dr. Whiting to establish the depression. There

24  was no falsity detected although the test is designed to catch falsifiers. Dr. Whiting's clear

25  interpretation of the results is provided in Exhibit 5. Dr. Fay, who has a subspeciality in police

26  officer cases, corroborates this (see Exhibit 6).

27

28

B.    *The Criminologists's Report and Summary of Exhibits*

Exhibits 3 and 4 are the report and curriculum vitae of Sheila Balkan, Ph.D., a brilliant and highly respected criminologist.  Dr. Balkan's penetrating report (Exhibit 3) summarizes Exhibits 5 through 19 and analyzes this extraordinary matter from the perspective of a criminologist with 31 years of experience.  Defense will not analyze each of these exhibits herein but submits Dr. Balkan's expert criminological analysis of the witnesses and this extraordinary matter to the Court.

IV.    **AUTHORITY TO ARGUE THE FACTORS UNDER TITLE 18 UNITED STATES CODE SECTION 3553(a)**

Under the Plea Agreement defendant has reserved his right to move for a variance from the United States Sentencing Guidelines range, based on factors in title 18 United States Code section 3553(a) (Plea Agreement, 8:26-28).  Defendant suggests that, in sentencing defendant, the Court should address the variance proposed by *Federal Sentencing Guidelines Manual* section 5K2.0(a)(3) for exceptional circumstances.

Title 18 of the United States Code section 3582(a) states that in determining whether to impose a term of imprisonment and the length of a term, the Court "shall consider the factors set forth in section 3553(a) to the extent they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation" (emphasis added).  While it is said this provision has been "built into" the guidelines, in this instance due to the failure of the guidelines to implement the directive in section 994(d)(4), the provision takes on heightened meaning.

**V.**      **THE POLICY STATEMENT FOR MENTAL AND EMOTIONAL CONDITIONS, *FEDERAL SENTENCING GUIDELINES MANUAL* SECTION 5H1.3, ISSUED PURSUANT TO TITLE 28 UNITED STATES CODE SECTION 994(d)(4)**

Defendant's "Mental and Emotional Conditions" are a proper basis for a downward departure and, in the event of a sentence of incarceration, for the Court's sentence recommendation pursuant to title 18 United States Code section 3621(b)(4)(A) and (B).

The directive of Congress in establishing the duties of the United States Sentencing Commission requires that consideration be given to "mental and emotional condition to the extent that such condition mitigates defendant's culpability or to the extent that such condition is otherwise plainly relevant" [28 U.S.C. § 994(d)(4), *supra*].  For these overarching policy reasons, the "Policy Statement" in the *Federal Sentencing Guidelines Manual* section 5H1.3 for "Mental and Emotional Conditions" provides:

> Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines.

[Volume 1, *Federal Sentencing Guidelines Manual* (West, 2012), § 5H1.3, p. 445.]  Consideration of policy statements issued by the Sentencing Commission under title 28 United States Code section 994(a)(2) is mandatory under title 18 United States Code section 3553(a)(5).

Taking us to only the entrance, the guidelines fail to go into the house of *individualized*, twenty-first-century justice, as will be seen below.  Defendant's case is distinguished from the *typical case* under the guidelines as provided under the "Policy Statement," as is established by defendant's mental and emotional conditions which are described in Exhibits 1, 3, 5, 6, and 7.

This is also within the mandated purposes of the Commission to "reflect, to the extent practicable, advancement in knowledge of human behavior as it relates to the criminal justice process; ..." [28 U.S.C. § 991(b)(1)(C)].  At one time mental disorders were part of a "dark science" that Americans simply did not want to talk about, much less address.  According to the Congress,

1   the days of "We don't understand it, so lock them up," have long passed; unfortunately, the

2   guidelines have not followed the directive (as to Zone D) nor caught up to the times.  Science has

3   shown mental illness can happen to anyone.  It is not, itself, a crime (and as Mike Wallace of

4   CBS News had so bravely stated after recovery from clinical depression, there is nothing to be

5   ashamed about, "Get help").

6           The United States Sentencing Guidelines in section 5K2.0(a)(3) generally also

7   provide for downward departure where the impact of the factor, here mental disease, is substantially

8   in excess of the ordinary.  *Federal Sentencing Guidelines Manual* section 5K2.0(a)(3) provides:

9           DEPARTURES BASED ON CIRCUMSTANCES PRESENT TO A
            DEGREE NOT ADEQUATELY TAKEN INTO
10          CONSIDERATION.--A departure may be warranted in an exceptional
            case, even though the circumstance that forms the basis for the
11          departure is taken into consideration in determining the guideline
            range, if the court determines that such circumstances is [*sic*] present
12          in the offense to a degree substantially in excess of, or substantially
            below, that which ordinarily is involved in that kind of offense.

13

14   (*Federal Sentencing Guidelines Manual, supra*, § 5K2.0(a)(3), p. 452, capitalized emphasis in

15   original.)

16           This is clearly the situation before the Court.  There is a causal relationship between

17   defendant's severe depression and these crimes.  Consistent with the directive of

18   title 28 United States Code section 3553(b)(1), where mitigating circumstances are "not adequately

19   taken into consideration" by the guidelines, that should result in a different sentence than described.[7]

20           It hardly need be stated that there are exceptional circumstances presented.  The

21   reports of Drs. Freed, Fay, Whiting, and Katz establish the existence of mental disease within the

22   meaning of title 28 United States Code section 994(d)(4) and under the Policy Statement in

23   section 5H1.3 and section 5K2.0(a)(3).  It simply cannot be maintained that circumstances of

24   defendant's mental illness are of the type that is "ordinarily involved" in the charged offenses

25

26   _____

27           [7]      Application Note 3(B)(i) to United States Sentencing Guidelines section 5K2.0
     describes the authorization to a further departure for mitigation "to a degree not adequately taken
28   into consideration in the guidelines" (*Federal Sentencing Guidelines Manual, supra*, p. 455).

[*Federal Sentencing Guidelines Manual, supra*, § 5K2.0(a)(3)]. But the guideline provisions do not take the exceptional factors into account for Zone D.

The Sentencing Commission recognized the problem, but no solution was provided.

Of course, the Presentence Report is right. Defendant had many other options, but in his mental condition, he simply could not "see" that he had options or that any of them could have had any effect. That is what depression is. The Presentence Report gives us some understanding of why the guidelines sentencing scheme for Zone D does not adequately address the problem as Congress directed, as will be seen below.

**VI.      WHERE THE PRESENTENCE REPORT GETS IT RIGHT BUT COMES TO THE WRONG CONCLUSION**

With all due respect for the hard work of the United States Probation Office, for the office itself (which is an example to other districts), and our great admiration of Ms. Goldsberry, the Presentence report "gets it right" up to its conclusion, but there it slips.

**A.      *The Causal Factor Is Mental Disease***

The report makes a correct and painstaking analysis of the destructive effect of defendant's psychological condition, finding consistently with three doctors (Drs. Freed, Whiting, and Fay) that defendant's:

> ... medical condition appears to have led to his mental health problems ... [which] appears to have ultimately led to his excessive criminal activity and eventual downfall

(Presentence Report, "Sentencing Recommendation," p. 3.) But thereafter, the Presentence Report concludes that "defendant should have known better" (Presentence Report, "Sentencing Recommendation," p. 3). Yes, *normally*, one would know that, but depression interferes with that

1  mental process.  Then, the report unfortunately concludes that *deterrence* under title 18

2  United States Code section 3553(a)(2)(B) is the overarching consideration.  It is not, nor is the

3  lengthy incarceration proposed.[8]

4        **B.**    ***Mental Disease Is Not Logical***

5        In the "Sentencing Recommendation" section of the Presentence Report, the officer

6  states she "remains baffled as to why the defendant became involved in the instant offense"

7  (Presentence Report, "Sentencing Recommendation," p. 2).  Of course, it is baffling; mental disease

8  is not logical.  It is illness.  The illness of severe depression corrupts the *logical* thinking of a

9  properly adjusted individual and has other serious effects.  As the report has determined, defendant

10  certainly did not need the money.  Defendant did not have any significant debt.  He had no reason to

11  commit any of the offenses which, now, in a sobering contemplation horrify him.  He was SICK.

12  There is not a base motive here; there is illness and a need for treatment.  Scientifically, in this case

13  it has been proven.

14        **C.**    ***Defendant's History and Characteristics***

15        The Presentence Report also does not attribute mitigation to the fact that the

16  defendant had a 20-plus-year career as a dedicated law enforcement officer, and it does not reconcile

17  that history with the radically aberrant behavior of the crimes, arising from the severity of the mental

18  illness.  The departure in defendant's criminal conduct is striking to all who see it.  It *distinguishes*

19  this case from the typical cases covered by the guidelines as described in the Policy Statement.

20

21

22

23        [8]     In our circuit, it is without question that it is not deterrence or punishment, but
rehabilitation that is the objective, "The sole objective of 18 U.S.C. section 3553(a)(2)(D) is not

24  punishment, but defendant's rehabilitation" [*U.S. v. Autery* (9th Cir. 2009) 555 F.3d 864, 877; 18
U.S.C. § 3582(a)].  Clearly, providing defendant with proper psychiatric and medical treatment is in

25  order under the directives in title 18 United States Code section 3553(a) (*U.S. v. Autery, id.*, at 877).
Clearly here, incarceration would *undermine* defendant's rehabilitation (*U.S. v. Autery, supra*,

26  at 877), as it no doubt already has.  Pursuant to the Policy Statement in section 5H1.3, a departure
ensuring treatment is appropriate.

27

28        This is consistent with title 28 United States Code section 3553(a)(2)D, which
requires the Court to consider a sentence which provides defendant with needed "medical care."

1   *Punishing* defendant, because he was a police officer, improperly applies an

2   aggravating factor, indeed a classification of punishment impermissibly based on a lawful

3   occupation, when defendant's 24-year history of exemplary conduct prior to his mental disease is a

4   mitigating factor.[9]  Even more so, under the Policy Statement, due regard should be given to the

5   mental condition present to such an unusual degree, an undeniable "circumstance" leading to the

6   offenses.

7       **D.    *When Defendant's Plea Was Taken***

8           After his arrest but prior to his plea, defendant was regularly obtaining medical care

9   for his neuropathy and receiving psychological treatment for his depression from Dr. Fay, who has a

10  subspecialty in police officer treatment.  Defendant committed himself to do good works and did

11  them for 30 plus hours each week for nine months.  But because these distinguishing characteristics

12  were not brought to the attention of the Honorable United States Magistrate Judge Westmore, on

13  acceptance of the plea, defendant was simply remanded to custody of the local jail, and <u>treatment</u> for

14  the mental and physical diseases <u>simply stopped</u>.  Instead, defendant was given drugs, which is what

15  the Presentence Report suggests should continue for 11.75 years.  The jail in which defendant is

16  incarcerated does not provide the needed services, nor does federal prison system (see Report of

17  Philip S. Wise, <u>Exhibits 8 and 9</u>).

18          Inexplicably, defendant's progressively debilitating medical condition

19  (Charcot-Marie-Tooth) and his mental illness (depression) were <u>not</u> brought to the attention of the

20  Honorable Magistrate Judge before whom defendant's plea was taken.  *Inexplicably* and for no valid

21  reason, surrender with no provision for treatment was made a condition of the plea agreement.  The

22  Honorable Judge Westmore was not advised of the defendant's need for treatment.  No reports were

23  prepared for the Court, and these issues were not even addressed.

24          Defendant is nearly crippled.  Defendant's use of his hands and feet is severely

25  limited.  Defendant is not a flight risk, is not a recidivist, and is no risk to the public.  Defendant

26  needed continuing medical and psychological attention.  Unfortunately, he has received very little

27

28

---

[9]     *U.S. v. Autery, supra.*

1    medical and psychological attention since remand into custody on December 5, 2012.  He is simply

2    given drugs.

3    **VII.**      **WHY IS NORMAN WIELSCH BEFORE THE COURT?  HIS HISTORY**

4                 **AND CHARACTERISTICS SAY THIS COULD NOT HAPPEN**

5                 Why are we here?  How could a 24-year decorated and accomplished, veteran

6    law-enforcement officer fall so dramatically far from his values and his life record?  Why is it so

7    "baffling"?  How can anyone explain it?

8                 The defendant here presents an exceptional case.  Here, a decorated and

9    accomplished 24-year officer of the law simply goes "haywire," committing *easily traceable*

10   offenses in the open, easy prey for a sleazy private investigator who "successfully" corrupted at least

11   three police officers.  **Why is Norman Wielsch here?  Only mental disease explains this case**.

12                 **A.**      ***Excellent in Surveillance Techniques, He Commits "Bonehead" Offenses***

13                 There does not appear to be a case like this in the reported annals.  A narcotics

14   bureau commander, rated "excellent in surveillance techniques" (see footnote 10) with decades of

15   training in the investigative means and methods of narcotics trafficking, commits what can only be

16   described as "bonehead" offenses in plain view, in the open with virtually no attempt to conceal his

17   involvement.  The officer signed out for the contraband <u>in his own name</u> and conducted himself

18   openly, using his own telephone and vehicle, all the while knowing about surveillance techniques,

19   concealed wires, surreptitious telephone taps, and concealed video equipment.  Appearing as though

20

21

22

23

24

25

26

27

28

1  in a fog, he is unnecessarily "present" for the hand-to-hand transfer between Mr. Butler and

2  Mr. Marino, when he easily could have used surreptitious techniques.  Why?[10]

3       **B.**   ***Only Mental Disease Explains It***

4       One must conclude that in his mental state defendant was oblivious to everything he

5  knew about surveillance, wire taps, concealed video, and narcotics investigations during the

6  commission of the offenses.  Defendant literally left a "trail" of evidence a mile wide and a foot

7  thick.  WHY?  Only mental disease explains this case.

8

9  _____

10       [10]   Quoting from Exhibit 18, the "Final Report of Performance for Probationary
Employee, Special Agent Norm Wielsch, 4/99/99 to 8/8/99, Page 1 of 2":

11

12       **SKILL**

13       Special Agent (SA) Wielsch's skill in the area of narcotic enforcement
is very good.

14       ...

15       SA Wielsch is excellent in surveillance techniques.  He has often been
the team leader during surveillance operations, and demonstrated

16  strong competence in the role of team leader during these operations.

17       **KNOWLEDGE**

18       SA Wielsch has a strong knowledge of the methods, materials, and

19  fundamental concepts of narcotic investigation.  SA Wielsch teaches
on occasion at the local police academy in Contra Costa County.

20

21  (See Exhibit 18.)

22       Quoting from the "Evaluation for:  Special Agent Norm Wielsch, Rater:  Special
Agent Supervisor Samuel Dudkiewiez, Rating Period:  March 2001 through March 2001 [*sic*]":

23

24       Additionally, as a result of your exposure to this investigation and its
incorporation of different investigative techniques such as PEN

25  registers, video and vehicle surveillance, undercover operations and
analytical development of intelligence, all leading to an electronic

26  intercept of telephones used by primary co-conspirators, your overall
investigative expertise has been enhanced.  As the primary

27  surveillance team leader, you demonstrated the ability ...

28

(See Exhibit 18.)

1    Physically deteriorating from a progressive noncurable disease and unable to use his

2  fingers to even load a cartridge in his weapon, depression, despair, and lack of self-worth take

3  charge; mental disease takes over the man.  He ideates suicide and even takes all but the last step to

4  accomplish it.  At the pinnacle of his career as commander of an elite strike force, defendant was

5  confronted with a humbling reality of the frailty of the human body.  Defendant has no feeling

6  below his knees.  His feet are horribly deformed.  He has had over 20 surgeries.  Defendant cannot

7  keep his balance and falls repeatedly.  Defendant is also losing the use of his hands, which are also

8  in pain due to the neuropathy.  He cannot perform simple tasks like fastening a button.  His fingers

9  are so degraded, he cannot load his service revolver.

10    The probation officer's admirable efforts to understand and find a valid motive for

11  such stupid crimes will never be requited.  Except for mental disease, Norman Wielsch's conduct is

12  inexplicable.  It clearly results from mental disorder and establishes the exceptional case, in need of

13  an adjustment beyond that provided in *Federal Sentencing Guidelines Manual* section 5C1.1(f),

14  which only provides for incarceration at the stated low range for the level.

15  **VIII.**       **THE CAUSES OF THE MENTAL DISORDER**

16    As recognized in the Presentence Report, the defendant was suffering from severe

17  clinical depression and despair brought on by his physical deterioration and a destroyed self-image

18  due to his physical incompetence.  Because defendant suffers from progressive and irreversible

19  neurological debilitation from the ominous-sounding "Charcot-Marie-Tooth" disease, he was not, at

20  only 49 years of age, capable of functioning even at a minimal level as a peace officer, much less as

21  the leader of an elite narcotics unit at the pinnacle of his career.  Defendant has no feeling in his legs

22  below the knee.  Defendant's feet are horribly distorted.  He has had 20 surgeries.  Defendant cannot

23  use his hands to do even simple tasks like buttoning a shirt or loading a cartridge into a weapon.

24  Defendant falls; he lacks balance; his muscles have atrophied; he needs metal braces; he cannot

25  effectively use his hands; he has chronic renal failure.  He has pains in his hands up to an 8 on a

26  scale of 10 as his nerves irreversibly and progressively deteriorate and cripple his extremities.  He

27  cannot run.  He cannot defend himself.  He is impotent.  He cannot keep from falling because he has

28  no feeling in his legs below the knee and no feeling in his feet.

1    As described in <u>Exhibits 1, 3, 5, and 6</u>, these conditions and the other "triggers" in a

2  life of high stress and repeated horrific experiences of death and violence, which are painstakingly

3  listed in the reports, led to despair and severe depression.

4  **IX.**      **THE FAILURE OF THE GUIDELINES TO PRESENT SUBSTITUTE**

5            **PUNISHMENTS IN ZONE D**

6    For sentence ranges in Zone D of the Sentencing Table, the provisions of the

7  United States Sentencing Guidelines fail to address mental and emotional conditions pursuant to the

8  directives of title 28 United States Code section 994(d)(4) and the Policy Statements recited above

9  [§ 5H1.3 and § 5K2.0(a)(3)].  The guidelines are of little assistance to the Court where

10  circumstances are substantially in excess of the ordinary, as here.  Although the other "zones" in the

11  Sentencing Table do have proposed substitute punishments for mental conditions, in actuality, there

12  is no "Schedule of Substitute Punishments" for offense levels falling into Zone D.

13        **A.**    ***When the Substitute Is Not a Substitute***

14    Instead of a substitute punishment, subsection (f) of United States Sentencing

15  Guidelines section 5C1.1 suggests imprisonment for the minimum guideline term for sentencing

16  ranges in Zone D.  [See *Federal Sentencing Guidelines Manual, supra*, § 5C1.1(f), p. 405.]

17  Applying the guideline term, albeit the low term, is really not a "<u>substitute</u>" for the guideline terms

18  at all.  For Zone D, United States Sentencing Guidelines section 5C1.1(f) fails to provide a

19  substitute to address mental conditions which are present to an unusual degree in cases

20  distinguished from the "typical cases covered by the guidelines" (§ 5H1.3, *supra*).

21    This is all the more glaring an omission in that, when a person is <u>impaired</u> by a

22  severe emotional or mental condition, as here, the seriousness of the offense leading to incarceration

23  levels in Zone D is not in the forefront of the mind of the offender.  On account of the disease

24  process, the offender does not "think straight" in the first place.  Allowing the low term of the

25  guideline range is not a "substitute," it is the same as the "typical cases covered by the guidelines"

26  (§ 5H1.3, *supra*) and does not provide a substitute for the mental condition as directed by Congress

27  in title 28 United States Code section 994(d)4.  Where, as here, the mental and emotional

28

1   conditions are in excess of the ordinary, applying a sentence *within* the guideline is not a <u>substitute</u>

2   for the guideline; <u>it is the same as the guideline</u>.

3         In the Commentary, Application Note 9, the Commission unlawfully amended

4   section 994(d)(4) and without constitutional authority limited its application to Zone D.  Of course,

5   the Court is not be bound by this excess, and the Court should therefore fashion the remedy it deems

6   appropriate under its constitutional authority and the directive of the statute.

7         **B.    *The Modality of Home Detention Under Other Sentencing Zones*_**

8         Under the United States Sentencing Guidelines, home detention makes the perfect

9   example of the guidelines' failure.  Home detention is permissible where the applicable guideline

10  range falls in Zone B and Zone C of the Sentencing Table [*Federal Sentencing Guidelines Manual*,

11  section 5C1.1(c) and (d)].  But under *Federal Sentencing Guidelines Manual* section 5C1.1(f), there

12  is no substitute punishment for Zone D.

13        **C.    *Other Examples of the Failure To Provide Appropriate Sentencing*_**

14        In a contrast that clearly establishes the significance of the omission at hand, the

15  United States Sentencing Guidelines <u>do</u> address mental health treatment in the event of probation

16  [*Federal Sentencing Guidelines Manual, supra*, § 5B1.3(d)(5), p. 401] and in the event of

17  supervised release [*Federal Sentencing Guidelines Manual, supra*, § 5D1.3(d)(5), p. 416].  But in

18  the case of sentencing ranges in Zone D or for Class A felonies, the only "relief" the guideline

19  contemplates is lengthy incarceration at the low level for "all comers," which is no "relief" and no

20  treatment at all.  Thus, in the most significant cases, which fall in Zone D, despite the progress of

21  science, the guidelines remain in the darker ages of the understanding of human conduct,

22  perpetuating a, "lock them up" solution.

23        **D.    *The Court Should Fashion an Appropriate Sentence*_**

24        Section 5C1.1(f) does not adequately address the unusual degree of mental and

25  emotional conditions present here, as is required under the statute [28 U.S.C. § 994(d)(4), *supra*]

26  and the Policy Statement for Mental and Emotional Conditions (*Federal Sentencing Guidelines*

27  *Manual, supra*, § 5H1.3).  <u>This is hardly the appropriate individualized sentencing mandated by</u>

28  <u>both the Supreme Court and by our Ninth Circuit Court of Appeal</u>.  The Court, exercising

1    constitutional powers under Article III, should sentence more appropriately.  The Court in exercise

2    of its discretion must create the appropriate sentence as directed by the statute.

3                    The United States Sentencing Guidelines *impermissibly* leave defendants falling into

4    sentencing ranges in Zone D with no mitigation, or at best, inconsequential mitigation.  As pointed

5    out above, the "low range" is available to all offenders in *typical* cases and is not "mitigation" for

6    the *atypical* case presented by defendant.  The guidelines for Zone D apply incarceration at the low

7    range [under *Federal Sentencing Guidelines Manual* § 5C1.1(f)] without recognizing that

8    *appropriate* medical treatment mandated under title 18 United States Code section 3553(a)(2)(D) is

9    not available in lengthy sentences and without adjusting for *individualized consideration* of the

10   extent which defendant's mental and emotional condition mitigates his culpability.  <u>In this instance,

11   the guideline suggestion is insufficient to effect the overarching sentencing policy directive in

12   title 28 United States Code section 3553(a)(1), requiring the Court to impose a "sufficient" sentence

13   in light of the "characteristics of the defendant,"</u> giving due consideration of the Policy Statement

14   for Mental and Emotional Conditions under title 28 United States Code section 3553(a)(5) and

15   implementing the directives of title 28 United States Code section 994(d)(4).

16           **E.    *The Guidelines Impermissibly Limit the Court's Discretion***

17                   The latitude for creativity permitted the Court under offense levels for Zones A, B,

18   and C, for no valid reason, <u>disappears</u> for offense levels in Zone D.  For example, Application

19   Note 6 to the Commentary to *Federal Sentencing Guidelines Manual* section 5C1.1 recognizes the

20   wisdom in permitting the Court to depart from the sentencing option (i.e., one half the minimum

21   term must be satisfied by imprisonment) where, for example, community detention or home

22   confinement is appropriate to accomplish a specific treatment purpose.  Application Note 6 suggests

23   the departure would be appropriate where (A) the defendant "suffers from a significant mental

24   illness," and (B) the defendant's criminality is related to the "treatment problem to be addressed."[11]

25                   For Zone D, however, where the same criteria as in the Zone C example in

26   Application Note 6 are present, under *Federal Sentencing Guidelines Manual* section 5C1.1(f) and

27   _____

28           [11]    See also Volume 3, *Federal Sentencing Guidelines Manual* (West, 2012),
     Appendix C, Amendment 738, page 344.

Application Note 9 in the Commentary, <u>no imprisonment substitutes to address the treatment problem would be permitted under the guidelines</u>.  Under subsection (f) of section 5C1.1, no imprisonment substitutes would be allowed, despite a defendant meeting identical criteria as in Application Note 6.  Treatment would not be an option open to the Court in the most serious cases when in <u>less serious circumstances</u> the Court is given wide latitude.

In this way, the United States Sentencing Guidelines for Zone D of the Sentencing Table and the United States Code fail to adequately reflect the intent and purposes of sentencing as established in section 3553(a) and as required under the Policy Statement for Mental and Emotional Conditions promulgated under section 994(d)(4) of title 28.  This fails to reflect the advancement of the science of "human behavior" in the criminal justice process as required by title 28 United States Code section 991(b)(1)(C) and is an unconstitutional and irrational impingement of the Court's powers under Article III.

The test is whether the sentencing is "unreasonable" [*U.S. v. Booker* (2005) 543 U.S. 220, 261; 125 S.Ct. 738, 765-766].  Herein, the test is not met, nor is the "mitigation" under section 5C1.1(f) in compliance with the directive in section 994(d)(4).  As such, the restrictions in Zone D are inappropriate, and the Court should fashion appropriate relief.

**X.**          <u>**FACTORS TO BE CONSIDERED UNDER 18 U.S.C. SECTION 3553(a)**</u>

Pursuant to the Policy Statement in *Federal Sentencing Guidelines Manual, supra,* section 5H1.3, "mental and emotional conditions ... in combination with other offender characteristics" are relevant in consideration of sentencing where these characteristics are "present to an unusual degree."  *Id.*

The existence of defendant's emotional disease is uncontested and is clearly at an unusual degree.  The other "offender characteristics" also clearly point to the need for a departure.

**A.**     *<u>First</u>*

Those characteristics to be considered first are:

(1)     The defendant's faithful service to law enforcement for 24 years is a mitigating factor that indicates defendant "has shown in his past that he can lead an honorable and responsible life"

1   (*U.S. v. Autery, supra*, at 874).  Indeed, it is clear that only mental disease took defendant off the

2   right path.[12]

3        (2)    Defendant has no convictions, indicating that his past conduct has been better than

4   required for Category I, warranting possible additional consideration as a mitigating factor.  (See

5   *U.S. v. Autery, supra*, at 874.)

6        (3)    There is no public safety concern.  Defendant's extremities are virtually crippled by

7   his progressive neurological disease (Charcot-Marie-Tooth).  Defendant is not a danger to society.

8   It is highly unlikely defendant will commit crimes if he receives the psychological and medical

9   treatment he needs, which are not available if he is incarcerated.  (See Report of Philip S. Wise,

10  Exhibit 8.)  Obviously, even were he so inclined, defendant will never have access to an evidence

11  locker, nor a badge, nor a service weapon.

12       (4)    Defendant's severe depression is a mental illness that can be treated out of custody.

13  Drs. Freed, Fay, and Whiting attribute the criminal conduct to defendant's depression and despair.

14  There is no other rational explanation for defendant's path of self-destruction arising from his

15  irreversible progressive debilitating disease, Charcot-Marie-Tooth.

16       (5)    Defendant needs medical care for the *severe* Charcot-Marie-Tooth disease which is

17  crippling defendant (Report of Dr. Katz, Exhibit 7).  He will not get that care, even in a Type IV

18  facility of the Bureau of Prisons (Report of Phillip S. Wise, Exhibit 8).  Under *Federal Sentencing*

19  *Guidelines Manual* section 5H1.4, defendant's physical condition is relevant under the "Policy

20  Statement" to determining a departure.  The guideline states:

21          An extraordinary physical impairment may be a reason to depart
            downward; e.g., in the case of a seriously infirm defendant, home
22          detention may be as efficient as, and less costly than, imprisonment.

23  [*Federal Sentencing Guidelines Manual, supra*, § 5H1.4, p. 445.]  Certainly, that is the case herein.

24       (6)    Defendant has engaged in charitable works after his arrest.  Prior to incarceration,

25  defendant worked at least 30 hours per week at the Salvation Army in Antioch, California.

26

27          [12]    As seen above, the "Sentencing Recommendation" in the Presentence Report turns
28  defendant's service into an aggravating factor.  The Ninth Circuit in *U.S. v. Autery, supra*, holds it
    should be otherwise.

1   Defendant also leads the Men's Fellowship Group at New Hope International Church.  Defendant's

2   postarrest behavior is relevant.

3          (7)     Defendant has shown remorse.  He has publicly apologized.  He acknowledged his

4   wrongdoing <u>immediately</u> on his arrest.  Defendant <u>immediately</u> confessed to his conduct and

5   immediately admitted his participation in the crimes.  Thereafter, defendant described his conduct to

6   investigators in several voluntary sessions and shared with local, state, and federal investigators his

7   full knowledge of the conduct.  Defendant has fully cooperated with the Government's investigation.

8          (8)     An unwarranted disparity of sentences, contrary to title 18 United States Code

9   section 3553(a)(6), will arise as between Chris Butler and defendant.  Mr. Butler was the initiating

10  factor in the charged crimes, and Mr. Butler induced many others -- including Carl Moreno and

11  Louis Lombardi -- to offend in a multitude of other crimes not involving defendant.[13]  Mr. Butler

12  has received 96 months and five years of supervised release.  Should defendant be sentenced to

13  incarceration greater than Mr. Butler's sentence, it would be an unwarranted sentencing disparity

14  among defendants with similar records who have been found guilty of similar conduct, contrary to

15  section 3553(a)(6).  Mr. Butler had no mental disease.

16     **B.**     ***Second***

17          Secondarily, the Court should look to other relevant "offender characteristics,"

18  "without regard to any statutory minimum sentence" under the factors described in title 18

19  United States Code section 3553(f).  As stated above, the Court's consideration of section 3553(f) is

20  mandatory.

21          While defendant roots his plea statement in the factors relevant under title 18

22  United States Code section 3553(a), before imposition of a sentence, the Court must also review the

23  application of subsection (f) of section 3553, title 18 United States Code.  Consideration of these

24  factors is "mandatory" for the sentencing trial court in this circuit [*U.S. v. Cardenas-Juarez*

25  (9th Cir. 2006) 469 F.3d 1331].

26

27          [13]     Mr. Butler was involved in and, Defense contends, *instigated* each of defendant's
    offenses.  Mr. Butler was also charged with multiple *additional* offenses, which did not involve

28  defendant.  The pattern has been established in his other offenses that Mr. Butler induced defendant,
    an otherwise law-abiding person, to commit crimes.

1      These factors constitute the "safety valve" appearing in title 18 United States Code

2  section 3553(f) and the United States Sentencing Guidelines section 5C1.2.  The Court in

3  sentencing is required to consider these "safety valve" factors as a matter of congressional directive

4  [*U.S. v. Cardenas-Juarez, supra*, 469 F.3d at 1335].

5      The Court should consider each of these factors in sentencing in accordance with the

6  goals and purposes established in title 18 United States Code section 3553(f).

7      The factors are:

8      (1)     the defendant does not have more than 1 criminal history
              point, as determined under the sentencing guidelines before
9              application of subsection (b) of §4A1.3 (Departures Based on
              Inadequacy of Criminal History Category);
10

11             [THIS FACTOR HAS BEEN SATISFIED.]

12     (2)     the defendant did not use violence or credible threats of
              violence or possess a firearm or other dangerous weapon (or
13             induce another participant to do so) in connection with the
              offense;

14             [THIS FACTOR HAS BEEN SATISFIED.]

15     (3)     the offense did not result in death or serious bodily injury to
              any person;
16

17             [THIS FACTOR HAS BEEN SATISFIED.]

18     (4)     the defendant was not an organizer, leader, manager, or
              supervisor of others in the offense, as determined under the
19             sentencing guidelines and was not engaged in a continuing
              criminal enterprise, as defined in 21 U.S.C. § 848; and
20
              [THIS FACTOR IS IN DISPUTE, BUT DEFENDANT
21             MEETS IT; SEE BELOW.]

22     (5)     not later than the time of the sentencing hearing, the defendant
              has truthfully provided to the Government all information and
23             evidence the defendant has concerning the offense or offenses
              that were part of the same course of conduct or of a common
24             scheme or plan, but the fact that the defendant has no relevant
              or useful other information to provide or that the Government
25             is already aware of the information shall not preclude a
              determination by the court that the defendant has complied
26             with this requirement.

27

28

1    [THIS FACTOR HAS BEEN SATISFIED; however, an
     evidentiary hearing may be necessary.[14]]

2

3    [*Federal Sentencing Guidelines Manual, supra*, § 5C1.2(a)(1) through (5), pp. 407-408.]

4              Thus, defendant meets factors (1), (2), (3), and (5) in the "safety valve."

5              As to factor (4), or section 3553(f)(4), it is clear defendant did not act as an organizer

6    or supervisor of "<u>others</u>" as is described under the statute.  The only "other" defendant acted with in

7    the charged conspiracy is Chris Butler.  The Government charged a <u>conspiracy of three persons</u>

8    [Mr. Moreno (the informant), Mr. Butler, and defendant].  It cannot be argued that defendant acted

9    as an organizer of "others" when defendant was only involved with the instigator, Mr. Butler.

10             Even if it could be argued that the purpose of this provision of the safety valve

11   [§ 3553(f)(4)] was to <u>exclude</u> otherwise qualifying candidates who organized or managed <u>one</u> other

12   (contrary to the plain language of the statute, which is plural, "others"), the evidence does not

13   establish that defendant was a leader, manager, or organizer as to Mr. Butler or as to Mr. Moreno.

14   Defendant had almost no contact with Mr. Moreno.

15             Under factor (4), there is no evidence that defendant was an "organizer, leader,

16   manager, or supervisor of others in the offense."  Defendant was clearly not a leader in the

17   methamphetamine transaction, and Mr. Butler was the proponent of selling same [see Government

18   Tape (BNE FR 2011-0015, ITEM #008-002, 2/11/11)].  Mr. Butler clearly conducted the sale, hand

19   to hand, to Mr. Moreno [see Government Tape (BNE FR 2011-0015, ITEM #013-002)].  After

20   Mr. Butler states that he, Mr. Butler, will take responsibility, defendant agrees to remove the

21   methamphetamine from the evidence locker.  Mr. Butler set the price, the time, and the place for the

22   sale at Mr. Butler's office.  Mr. Butler set up the meeting for the sale.  Mr. Butler received the cash

23   from Mr. Moreno and counted it.  Mr. Butler then put on gloves, retrieved the methamphetamine

24   from a hiding place in his office, and handed it to Mr. Moreno, first removing a plastic cover he had

25

26

27         [14]     The Presentence Report indicates the Government has not conceded this factor.
     Defense contends it is not in any seriously contemplated doubt.  Defendant willfully gave several

28   interviews to local, state, and federal investigators.

touched, all while defendant stands by, apparently in a fog.  At most, defendant re-counts the

marked money which was handed to defendant by Mr. Butler.  Mr. Butler also pays Mr. Moreno.

The Commentary under *Federal Sentencing Guidelines Manual* section 5C1.2

attempts to define the meaning of the relevant phrase in title 18 United States Code

section 3553(f)(4) that defendant was not an "organizer, leader, manager, or supervisor of others" as

"a defendant who receives an adjustment for an aggravating role under 3B1.1 (Aggravating Role)."

In relevant part, section 3B1.1(c) in circular fashion merely repeats the terms "organizer, leader,

manager, or supervisor" in a criminal activity and is not instructive in determining eligibility under

the safety-valve factor.  But the Commentary to section 3B1.1 is instructive and establishes that for

purposes of the factor in section 3553(f)(4), defendant was <u>not</u> an "organizer, leader, manager, or

supervisor of others."  The Commentary to Application Note 4 states:

> *4.     In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling.  Factors the court should consider include the <u>exercise of decision making authority</u>, the <u>nature of participation in the commission of the offense</u>, the <u>recruitment of accomplices</u>, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.  There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.  This adjustment does not apply to a defendant who merely suggests committing the offense.*

(*Federal Sentencing Guidelines Manual, supra*, § 3B1.1, p. 342, italics in original, underlined

emphasis added.]  Defendant does not meet <u>any</u> of the characteristics described in Application

Note 4.

Thus, while the Plea Agreement contains an adjustment guideline under

section 3B1.1(c), defendant does not meet the factors set forth in the Commentary as to factor (4).

The evidence clearly establishes defendant did not recruit either Mr. Butler or Mr. Moreno.  The

evidence clearly establishes Mr. Butler recruited Mr. Moreno and then made the decisions and

exercised authority.  The evidence clearly establishes that Mr. Butler arranged the transaction with

Mr. Moreno and that Mr. Butler performed the hand-to-hand transfers of drugs to Mr. Moreno.  The

nature of defendant's participation in the offense does not establish defendant was an organizer,

1  leader, manager, or supervisor of others. Defendant simply did not exercise any authority, direction,

2  or control over Mr. Butler or Mr. Moreno or instruct Mr. Butler regarding disposition of the

3  methamphetamine, set a price, or establish a planned distribution [*U.S. v. Canania* (8th Cir. 2008)

4  532 F.3d 764, 771-772]. Defendant's conduct can easily be contrasted to that of the organizer/leader

5  defendant in *U.S. v. Frausto* (C.A. 8 Neb. 2011) 636 F.3d 992.

6       Defendant is thus eligible for the limitation of a statutory minimum under guideline

7  section 5C1.2(a) and title 18 United States Code section 3553(f).

8  **XI.     THE COURT'S STATEMENT AND RECOMMENDATIONS AND**

9  **          POSSIBLE REPORT**

10      In the unlikely event the Court sentences defendant to a lengthy incarceration, the

11  Defense requests the Court elucidate the purposes of the sentence under title 18 United States Code

12  section 3621(b)(4)(A)[15] and describe the type of facility it recommends by specifying the treatment

13  and medical care needed [under 18 U.S.C. § 3621(b)(4)(A)].

14      Defendant also requests the Court specify under section 3621(b) the Policy Statement

15  for Mental and Emotional Conditions (*Federal Sentencing Guidelines Manual, supra*, § 5H1.3) and

16  the Policy Statement for Physical Condition (*Federal Sentencing Guidelines Manual, supra*,

17  § 5H1.4) and defendant's needed medical care [18 U.S.C. § 3553(a)(2)(D)].

18      **A.     *If Incarcerated, Defendant Will Not Get the Treatment He Needs***

19      A lengthy incarceration will not provide defendant with "needed ... medical care ... in

20  the most effective manner" as required under the provisions of title 18 United States Code

21  section 3553(a)(2)(D). In Exhibit 8, page 7, Mr. Wise describes the limited medical care available

22  should defendant be incarcerated.

23

24

25

26      [15]     Under title 78 United States Code section 3621(b), the Bureau of Prisons may

27  designate any "correctional facility" meeting its standards, taking into consideration the nature of the
offense; the history and characteristics of the defendant; and (4) "any statement by the court ...

28  (A) concerning the purposes" of the sentence or (B) recommending the type of facility; and (5) the
Policy Statements.

1      **B.**      *Efficiencies and Costs*

2              Because of the defendant's medical condition, the cost of imprisonment in a Bureau

3   of Prisons facility is at least $153 per day (see Report of Phillip S. Wise, <u>Exhibit 8</u>) for a Type IV

4   facility, plus $1,624 per day hospital care each time there is a foot infection or a fall with injury.

5   Both hospitalization eventualities are near certainties due to defendant's medical condition.

6   Defendant has chronic renal insufficiency.  Defendant is prone to neuropathic ulcers which easily

7   become infected.  Defendant has had multiple "MRSA" (Methicillin-Resistant Staphylococcus

8   Aureus) infections and will forever be prone to same upon the <u>neuropathic ulcers</u> occurring on

9   defendant's feet and for any open wound.  These are life-threatening infections which usually require

10  complete isolation, indicating the normal or average hospital cost is not an accurate gauge of the

11  true cost.

12              Because of defendant's status as an ex-narcotics commander, defendant will require

13  segregation from the general population for his safety, at a very significant cost that is not reflected

14  in the report and which will incrementally exceed $153 per day.

15              On the other hand, under home confinement, defendant would cover his own board

16  and keep, paying for all costs of monitoring, and for his own health care, with the medical providers

17  familiar with his conditions.

18      **C.**      *Vulnerability*

19              As defendant is a former commander of a narcotics investigation unit, defendant's

20  life will be in constant danger throughout any incarceration.  If incarcerated, Mr. Wise opines that

21  defendant must go to a Type IV facility due to his severe Charcot-Marie-Tooth disease.  In a

22  Type IV facility, all classes of prisoners will be present, creating additional uncalculated risk to

23  defendant's safety.  Defendant will be particularly vulnerable in a prison environment (see Report of

24  Phillip S. Wise, <u>Exhibit 8</u>, pp. 6 and 8), especially so because defendant will receive most of his

25  needs not from the attention of a health care provider, but from another inmate!  (See Report of

26  Phillip S. Wise, <u>Exhibit 8</u>, pp. 6 and 8.)

27

28

1

      **D.**    ***Bureau of Prisons Report***

2

            Finally, in light of the extraordinary circumstances presented, it is entirely possible

3

the Court would request a report under title 18 United States Code section 3552(b) to determine

4

particulars of "the sentence to be imposed." In light of the unique challenges presented in this

5

matter, defendant agrees to the additional 60 to 120 days as may be necessary and, if indicated, to an

6

even greater period as may be helpful to a proper resolution of this case.

7

                                     Respectfully submitted,

8

                                     LAW OFFICES OF
                                     RAYMOND N. STELLA ERLACH

9

10

Dated: May 3, 2013

                                     Raymond N. Stella Erlach

11

jpX5\Wielsch\departure.mot

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                          Case No. CR 11-00529-1 SBA (KAW)
                                  DEFENDANT WIELSCH'S MOT. FOR DEPARTURE
27    AND REQUEST FOR EVIDENTIARY HEARING

1    **Case No. 11-00529-1 SBA (KAW)**

2    **PROOF OF SERVICE BY HAND DELIVERY**

3         I, the undersigned, say:

4         I am a resident of the State of California and not a party to the within action; my

5    business address is the Law Offices of Raymond N. Stella Erlach, 275 Battery Street, Suite 2600,

6    San Francisco, California 94111.  On May 3, 2013, I caused to be served the within:

7    **DEFENDANT NORMAN E. WIELSCH'S MOTION FOR DEPARTURE**
     **AND REQUEST FOR EVIDENTIARY HEARING**
8    **AND EXHIBITS 1 THROUGH 19**
     **[Local Rule 32-5(b)]**
9

10   on the interested parties in said action by hand delivery to each of the following:

11       **Melinda Haag, Esq., United States Attorney**
         **Miranda Kane, Esq., Chief, Criminal Division**
12       **Hartley M. K. West, Esq., Assistant United States Attorney**
         **450 Golden Gate Avenue, Box 36055**
13       **San Francisco, CA  94102**

14       **Ms. Jessica A. Goldsberry, U.S. Probation Officer**
         **United States Probation Office**
15       **Northern District of California**
         **1301 Clay Street**
16       **Oakland, CA  94612**

17         I declare under penalty of perjury under the laws of the State of California that the

18   foregoing is true and correct.

19         Executed on May 3, 2013, at San Francisco, California.

20

21   _____
                                                        Raymond N. Stella Erlach
22   jpX5\Wielsch\proof.hnd

23

24

25

26

27

28