MELINDA HAAG (CABN 132612)
United States Attorney

MIRANDA KANE (CABN 150630)
Chief, Criminal Division

HARTLEY M. K. WEST (CABN 191609)
Assistant United States Attorney

    450 Golden Gate Ave., Box 36055
San Francisco, California 94102
Telephone:  (415) 436-7200
Fax: (415) 436-7234
E-Mail: hartley.west@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,    ) | No. CR 11-00529-1 SBA |
|     Plaintiff,        ) | UNITED STATES' SENTENCING |
|             ) | MEMORANDUM |
|   v.           ) | |
|          ) | Sentencing Date: May 20, 2013 |
| NORMAN WIELSCH,     ) | Time: 1:00 P.M. |
|           ) | |
|     Defendant.     ) | |

## I.  INTRODUCTION

        Defendant Norman Wielsch entered into a plea agreement precluding him from seeking a

sentence below the ten year mandatory minimum applicable to his narcotics conspiracy charge.

Despite announcing that he is "leav[ing] the baby on the Court's doorstep" due to this agreement,

Wielsch nonetheless "requests the Court impose a sentence of home confinement."  Defendant's

Motion for Departure (Def. Mtn.) at 3.  If the Court is inclined to entertain Wielsch's request for

sentence below the statutory mandatory minimum, the government asks for an opportunity to

consider whether to rescind the plea agreement based on his breach.  Assuming the Court is not

so inclined, the government submits this Sentencing Memorandum requesting a sentence of 210

months – the high end of the advisory Sentencing Guideline range.

U.S. SENTENCING MEM.
CR 11-00529-1 SBA

## II.  BACKGROUND

**A.     Plea Agreement**

On December 5, 2012, Wielsch pleaded guilty, pursuant to a plea agreement, to five counts in the Indictment: conspiracy to possess with intent to distribute and to distribute marijuana and 50 grams or more of methamphetamine (Count One), theft from programs receiving federal funds (Count Twelve), civil rights conspiracy (Counts Fourteen and Sixteen), and Hobbs Act robbery (Count Seventeen).  In Paragraph 2 of the plea agreement, Wielsch admitted the following facts.

**B.     Offense Conduct Admitted by Wielsch in Plea Agreement**

Between approximately June 2004 and February 16, 2011, Wielsch was a California Department of Justice Special Agent Supervisor and the Commander of the Central Contra Costa County Narcotics Enforcement Task Force (CNET), a regional task force operated by the California Department of Justice, Bureau of Narcotics Enforcement.

1.     Narcotics Conspiracy (Count One)

Between at least November 2010 and continuing through February 16, 2011, Wielsch entered into an agreement with private investigator Christopher Butler to sell marijuana and 50 grams or more of methamphetamine.  Specifically, in November 2010, Wielsch stole marijuana that CNET had seized during a search.  Wielsch told Butler that he had obtained the marijuana, and that he wanted to sell it to make money before retiring.  Wielsch gave Butler at least eight to ten vacuum-sealed plastic bags, each containing approximately one pound of marijuana.  Butler agreed to sell the marijuana, and to split the proceeds evenly with Wielsch.

In furtherance of this agreement, in November 2010, Butler gave one of the bags of marijuana to one of his employees, C.M., to sell for $1,500 per pound.  Butler gave C.M. four more bags of marijuana to sell in December 2010 and January 2011.  Butler gave Wielsch half of the proceeds from these sales.

On or about January 27, 2011, CNET officers legally seized approximately fifty pounds of higher quality marijuana.  Wielsch told Butler about the seizure and asked whether he could sell some of the marijuana.  On or about January 30, 2011, at Wielsch's request, Butler drove to

CNET's offices and helped Wielsch take approximately twelve pounds of the higher quality marijuana and return some of the marijuana that Wielsch had previously provided to him. Beginning on or about February 1, 2011, Butler gave C.M. approximately two pounds of the higher quality marijuana, as well as fifteen vials of steroids that Wielsch had given Butler to sell. Butler paid Wielsch approximately $2,600 from these sales.

In early February 2011, Wielsch advised Butler that CNET officers had seized approximately three pounds of methamphetamine, which would soon be destroyed. A few days later, Butler advised Wielsch that C.M. said he had a potential buyer for the methamphetamine at $10,000 per pound. In furtherance of their agreement, on February 15, 2011, Butler met Wielsch at CNET's office, drove with Wielsch to the Contra Costa County Sheriff's Evidence facility, and picked up the methamphetamine. Back at Butler's office, Butler and Wielsch met up with C.M. and sold him one of the packages of methamphetamine, wrapped in the form of a burrito, at an agreed-upon price of $9,800. Butler gave Wielsch $5,000 and took $2,500 for himself; C.M. kept the remainder. Wielsch agreed that the net weight of the methamphetamine sold to C.M. was approximately 435.4 grams, with purity of approximately 93.7%.

2.   Theft from Program Receiving Federal Funds (Count Twelve)

As described above, on or about February 15, 2011, Wielsch knowingly and intentionally stole, obtained by fraud, or otherwise without authority converted to his own use methamphetamine that had been seized by CNET during a law enforcement operation. Wielsch agreed that the methamphetamine was under the care, custody, and control of CNET and the Contra Costa County Sheriff's Evidence facility. He further agreed that the value of the marijuana and methamphetamine he took exceeded $30,000 but was less than $70,000, and that CNET received more than $10,000 in federal funds during the one year period of February 15, 2010, to February 15, 2011.

3.   Civil Rights Conspiracy (Count Fourteen)

Between January 2009 and February 6, 2009, Wielsch knowingly and intentionally agreed with Butler and others to deprive an individual, F.S., of his right against unreasonable searches and seizures and his right against deprivation of liberty and property without due process of law.

U.S. SENTENCING MEM.
CR 11-00529-1 SBA                    3

As part of this conspiracy, Butler was hired by F.S.'s mother to conduct a "sting" operation against F.S. in an attempt to deter him from selling illegal drugs. Butler enlisted Wielsch and more than three other individuals, to participate in the sting, which was to involve a staged arrest of F.S. during a drug transaction in CNET's parking lot. Specifically, Butler instructed two women who were working for him to develop a relationship with F.S. and, thereafter, to arrange to have F.S. sell ecstasy to their friend for $600. On February 6, at Butler's instruction, the women met up with F.S., arranged to have him drive his car, and accompanied him to the ecstasy sale, which occurred in the CNET parking lot. Upon their arrival, as earlier agreed upon, Wielsch drove up wearing his loaded firearm, handcuffed, and interrogated F.S. Wielsch further agreed to and did participate with Butler in searching F.S.'s pockets, car, and bedroom. Butler and Wielsch seized and maintained thousands of Xanax pills that they found during the search. At the conclusion of the search, F.S. was released from his handcuffs.

4.   <u>Civil Rights Conspiracy (Count Sixteen)</u>

From approximately January 2010 through approximately August 2010, Wielsch knowingly and intentionally agreed with Butler to deprive persons engaged in the business of prostitution of their rights against unreasonable searches and seizures and their rights against deprivation of property without due process of law.

As part of this conspiracy, Wielsch found prostitutes through online advertisements, such as Craigslist and Redbook, and arranged meetings with them, usually in hotels. On at least four occasions, Butler accompanied Wielsch to meet the women at hotel rooms in San Ramon, California, and other towns in the Northern District of California. Typically, Butler went to the room and knocked, while Wielsch pushed his way in behind after the door was opened, displayed his badge, and stated that he was a law enforcement officer. Wielsch and Butler then took cell phones, money, and sometimes computers or other property from the women before they left the room. They did not issue citations or property receipts during these encounters. Butler and Wielsch split the cash proceeds from these raids. Butler retained the cell phones in his office.

5.   <u>Hobbs Act Robbery (Count Seventeen)</u>

In or about July or August 2010, Wielsch knowingly and intentionally robbed and

conspired to rob two individuals, J.H. and S.P., in San Ramon, California.  Specifically, as part of their conspiracy to take cell phones and money from prostitutes, Wielsch and Butler went to a room at the Homestead Suites hotel in San Ramon where they met a prostitute and her madam, J.H.  Wielsch and Butler identified themselves as police officers, and took cash, two cell phones, and a set of car keys from J.H. and a man with whom she was traveling, S.P.  Wielsch agreed that they took more than $10,000 collectively from J.H., S.P., and others in the course of their prostitution robberies.  Wielsch further agreed that these robberies affected interstate commerce because they used Craigslist and other websites to identify their victims, and because many of the cell phones they stole were manufactured out of state, among other reasons.

C.   **Additional Offense Conduct Provable by Government**

In addition to all the facts to which Wielsch agreed as part of his plea, the government is prepared to prove that, on February 11, 2011, Butler called Wielsch to determine when they could obtain methamphetamine that Wielsch told him CNET had seized.  The call was intercepted through a wire tap order issued by the state court.  Wielsch said there were three to four pounds of "the crystal stuff."  Butler advised he had a buyer for "10k" per pound.  Wielsch laughed, and then warned Butler to make sure that the buyer was "not a cop."  Observing that "this is a whole different level," Wielsch said that he and Butler could pick up the drugs for destruction and go to the dump on Tuesday.  In a follow-up call, Wielsch explained that one pound of the methamphetamine was "in a burrito" and "two, two and a half" were in tupperware.  Later that evening, Wielsch called Butler, joking about the small denominations of C.M.'s payment for the prior marijuana deal.

At the behest of the California Department of Justice, C.M. wore a wire and a camera during the methamphetamine deal on February 15, 2011.  The video footage shows Butler count out $5000, hand it over to Wielsch for him to count, and hand the remaining money back to Marino.  The footage then shows Butler retrieving a "burrito" of methamphetamine, wearing gloves to avoid fingerprints.  Wielsch's voice is audible.  Marino then left with the white bag containing the burrito.  Further footage shows Marino paying Butler an additional $2,500 later that day – Butler's cut of the proceeds.

**D.**     **Agreements as to Sentencing**

      The terms of the plea agreement provide, among other things, that Wielsch agrees "not to seek a sentence below the mandatory minimum, ten years" (Plea ¶ 7), and that he will pay a $150,000 fine (Plea ¶ 9).  In exchange, the government agreed to recommend the Guidelines calculations set out in Paragraph 7, "unless the defendant violates the terms of the Agreement above or fails to accept responsibility."  The Guidelines calculation is as follows:

Narcotics Conspiracy (Count 1)

| | | | |
|---|---|---|---|
| a. | Base Offense Level, U.S.S.G. § 2D1.1(a)(5): | | 34 |
| b. | Specific offense characteristics: | | |
| | Aggravating role, U.S.S.G. § 3B1.1(c): | | +2 |
| | Abuse of position of trust, U.S.S.G. § 3B1.3: | | +2 |
| c. | Adjustments: | | 0 |
| d. | Adjusted offense level: | | 38 |

Drug Theft (Count 12)

| | | | |
|---|---|---|---|
| a. | Base Offense Level, U.S.S.G. § 2B1.1(a)(2): | | 6 |
| b. | Specific offense characteristics: | | |
| | Loss >$30,000, U.S.S.G. § 2B1.1(b)(1)(D): | | +6 |
| c. | Adjustments: | | 0 |
| d. | Adjusted offense level: | | 12 |

Civil Rights Conspiracy (Count 14)

| | | | |
|---|---|---|---|
| a. | Base Offense Level, U.S.S.G. § 2H1.1(a)(2): | | 12 |
| b. | Specific offense characteristics: | | |
| | Under color of law, U.S.S.G. § 2H1.1(a)(2): | | +6 |
| c. | Adjustments: | | 0 |
| d. | Adjusted offense level: | | 18 |

Civil Rights Conspiracy (Count 16)

| | | | |
|---|---|---|---|
| a. | Base Offense Level, U.S.S.G. § 2H1.1(a)(1): | | 23 |
| | Based on offense level for Count 17 | | |

|   |   |   |   |
|---|---|---|---|
| b. | Specific offense characteristics: | | |
|    | Under color of law, U.S.S.G. § 2H1.1(b)(1): | +6 |
| c. | Adjustments: | 0 |
| d. | Adjusted offense level: | 29 |

Hobbs Act Robbery (Count 17)

|   |   |   |
|---|---|---|
| a. | Base Offense Level, U.S.S.G. § 2B3.1(a): | 20 |
| b. | Specific offense characteristics: | |
|    | Loss >$10,000, U.S.S.G. § 2B3.1(b)(7)(B): | +1 |
| c. | Adjustments: | |
|    | Abuse of position of trust, U.S.S.G. § 3B1.3: | +2 |
| d. | Adjusted offense level: | 23 |

Grouping

|                       | Level | Units |    |
|-----------------------|-------|-------|----|
| Group I (Counts 1 & 12) | 38  | 1     |    |
| Group II (Count 14)     | 18  | 0     |    |
| Group III (Count 16 & 17) | 29 | 0    |    |
|                       |       | 1     | +0 |

|   |   |   |
|---|---|---|
| a. | Grouped Offense Level, U.S.S.G. §§ 3D1.1-3D1.4: | 38 |
| b. | Acceptance of Responsibility: | -3 |
| c. | Total offense level: | 35 |

The government acknowledges that the PSR determined Counts 1 and 12 do not group, but this does not affect the overall Guidelines calculation.

## III. ARGUMENT

### A. 18 U.S.C. § 3553(a)

Title 18, United States Code, Section 3553(a) requires the court to "impose a sentence sufficient, but not greater than necessary" after considering "the nature and circumstances of the offense and the history and characteristics of the defendant;" the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and provide the defendant with training, medical care, or other correctional treatment; the Sentencing Guidelines; and the need to avoid unwarranted

sentencing disparity between similarly situated defendants.  Taking together all of these factors, the government asks the Court to impose a sentence of 210 months' imprisonment, a $150,000 fine, five years' supervised release, and a $500 special assessment.

> 1.   Nature and Circumstances of the Offense; Seriousness of the Offense; Promotion of Respect for the Law; Just Punishment

The nature and circumstances of the offenses are egregious.  Wielsch was the head of a state-sponsored narcotics enforcement team.  He used his position of trust to steal methamphetamine and marijuana seized by the team, he enlisted others to sell these drugs, he kept 50% – the greatest share – of the proceeds, and he carried a firearm during at least the methamphetamine sale.  He also used his position of trust to rob prostitutes of more than $10,000 – displaying his badge and announcing he was law enforcement – and depriving them of their civil rights.  And he used his position of trust – wearing his loaded service firearm and using CNET's parking lot – to deprive a young man of his civil rights by falsely arresting and handcuffing him; searching his person, car, and bedroom; and seizing thousands of Xanax pills found during the search.

Additionally, the relevant conduct includes the counts in the Indictment to which he did not plead guilty – the possession and distribution of marijuana and methamphetamine (Counts Two, Four, and Six); the theft of marijuana from programs receiving federal funds (Counts Ten and Eleven); and extortion under color of official right, arising out of taking protection money from an illicit massage parlor (Count Fifteen).

The seriousness of this conduct demands a serious sentence, to assure just punishment, promotion of respect for the law, and adequate deterrence.

> 2.   History and Characteristics of the Defendant; Need for Medical Treatment

> > a.   Medical Characteristics

During all of the offense conduct, Wielsch was a Special Agent Supervisor of the California Department of Justice and the Commander of the regional drug task force CNET.  He did not have a violent or particularly troubled childhood.  In or after 1999, he was diagnosed with peripheral neuropathy, with complications from Charcot-Marie-Tooth disease, a disorder

involving loss of muscle tissue and sensation.  As a result of these health problems, Wielsch had numerous foot surgeries and suffered erectile dysfunction.  As he continued to lose feeling in his hands, Wielsch developed difficulty handling his service firearm.  In 2010, Wielsch's health problems caused him to fall during an attempted law enforcement entry of a home. Wielsch did not step down from his active duties but did contemplate suicide.  (PSR ¶ 88.)

To conceal his failing health from his colleagues and superiors, Wielsch "lied" because "he did not want to admit what was happening to him" and take a desk job or retire.  (PSR ¶ 83.) While Wielsch's lies may have protected his own ego, they undoubtedly put his colleagues at increased risk.

The Bureau of Prisons has extensive medical facilities and capabilities, and is trained to handle all manner of physical and mental health problems.  Wielsch's physical and mental health problems can be dealt with in the course of him serving his sentence.  They do not warrant a downward departure or otherwise reduced sentence.

b.   <u>Other Characteristics</u>

The government is concerned about what appears to be a deflection of responsibility.  In his interview with Pretrial Services, Wielsch reported that he participated in the prostitution robberies because Butler had videotaped Wielsch's sexual encounter with two women and threatened to send it to Wielsch's wife.  Neither Wielsch nor his attorney ever told the United States this, despite extensive discussions between the United States and Wielsch regarding his involvement in the prostitution robberies, nor claimed his involvement in the robberies was the result of duress.

Similarly, in his Sentencing Memorandum, Wielsch asserts that his conduct was the result of mental disease" (Def. Mtn. at 6-7, 10-16, 19-20), that he fell "prey" to Butler, and that he was not "a leader or instigator," (Def. Mtn. at 5, 13).  Although Wielsch argues that "[o]nly mental disease can explain" his criminal conduct (Def. Mtn. at 5), the United States can think of another explanation, one that motivates many other criminals, including other corrupt police officers: greed.  Both Wielsch's greed and his leadership role are apparent in the recorded his phone calls with Butler, in which Wielsch laughs when Butler says has a buyer for "10k" per pound of

methamphetamine, warns Butler to make sure that the buyer is "not a cop," observes that "this is a whole different level," and invites Butler to accompany him to pick up the drugs. Wielsch's leadership role and greed are further apparent in the division of proceeds from Wielsch's drug thefts and sales – Wielsch got 50%, Butler got 25%, and C.M. got 25%.

Wielsch also blames his prior attorney for his having been remanded to custody upon entry of his guilty plea, based at least in part on counsel's failure to advise the Magistrate Judge of his medical conditions and his performance of "good works." Def. Mtn. at 12. In so arguing, Wielsch ignores that remand to custody was mandatory under 18 U.S.C. § 3143(a)(2). His medical conditions and any other personal characteristics were irrelevant.

Based on Wielsch's personal history and characteristics, a 210-month sentence at the high-end of the Guideline range is appropriate.

       3.    <u>Avoidance of Unwarranted Disparity</u>

Contrary to Wielsch's suggestion, sentencing him to 210 months does not result in a disparity with any similarly situated defendant. Butler pleaded guilty pursuant to a cooperation agreement, and he cooperated before Wielsch decided to plead guilty. Butler is thus not similarly situated, and his sentence received pursuant to a 5K agreement is irrelevant.

**B.**    **18 U.S.C. § 3553(f)**

Wielsch argues that he is entitled to a lesser sentence pursuant to the "safety valve," 18 U.S.C. § 3553(f). Not so. The safety valve is not available to any defendant who was "an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines." 18 U.S.C. § 3553(f)(4). Wielsch agreed in Paragraph 7 of his plea agreement that a two-level enhancement was appropriate for his aggravated role in the narcotics conspiracy, under U.S.S.G. § 3B1.1(c). Section 3B1.1(c) applies to one who was "an organizer, leader, manager, or supervisor" in the offense.

Moreover, the finding that Wielsch was an organizer, leader, manager, or supervisor in the narcotics conspiracy is supported by the facts to which Wielsch agreed in Paragraph 2 of his plea agreement. He stole marijuana in November 2010 and only later told Butler about it. He obtained double the proceeds that Butler and C.M. obtained. He told Butler about CNET's

U.S. SENTENCING MEM.

January 2011 seizure of marijuana, and asked Butler to sell some of it.  And, in intercepted calls, he warned Butler to make sure that the buyer for the methamphetamine was "not a cop" and invited Butler to accompany him to pick up the drugs.

The safety valve is also unavailable to a defendant who has not "truthfully provided to the Government all information and evidence that defendant has concerning the offense or offense that were part of the same course of conduct or of a common scheme or plan." 18 U.S.C. § 3553(f)(5).  The United States does not believe that Wielsch has truthfully provided it with all information he has regarding offenses in the same course of conduct as the offenses to which he has pleaded guilty.  Specifically, Wielsch denies having participated in the Hobbs Act extortion involving illicit massage parlors, as charged in Count Fifteen of the Indictment.  While this conduct was not included in Wielsch's plea agreement, the government nonetheless has credible evidence that Wielsch did, under color of official right, conspire to obtain money from an illicit massage parlor in exchange for shielding it from law enforcement action.

For these reasons, the government would not recommend application of the safety valve. There is no need for an evidentiary hearing.

## IV.  CONCLUSION

For the foregoing reasons, the United States asks the Court to sentence the defendant, Norman Wielsch, to an imprisonment term of 210 months; a supervised release term of five years; a $150,000 fine; and $500 in special assessments.


DATED: May 13, 2013                     Respectfully submitted,

                                        MELINDA HAAG
                                        United States Attorney


                                             /s/
                                        _____
                                        HARTLEY M. K. WEST
                                        Assistant United States Attorney